**STATE of Tennessee, Appellee,**

v.

**Clarence GARLAND, Jr., Appellant.**

Court of Criminal Appeals,
at Knoxville.

Feb. 10, 1981.

Permission to Appeal Denied by Supreme Court on May 4, 1981.

Lanny R. Norris, Dan M. Laws, Jr., Elizabethton, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, David Crockett, Dist. Atty. Gen., Elizabethton, William Mooney, Asst. Dist. Atty. Gen., Johnson City, for appellee.

## OPINION

TATUM, Judge.

The defendant, Clarence Garland, Jr., appeals from a conviction for first-degree murder for which he was sentenced to the penitentiary for life. He was also convicted of arson and sentenced from 6 to 21 years in the State penitentiary. He was found guilty of petit larceny and concealing stolen property for which he was sentenced to the penitentiary from 2 to 5 years on each of these convictions. The conviction for arson was used to trigger the habitual criminal statute and the punishment for arson was enhanced to life imprisonment. All sentences were ordered to run consecutively with each other and consecutive to a sentence he was serving at the time of trial.

As suggested by the State, T.C.A. § 39–4218 precludes convictions for both larceny and concealing stolen property arising from the same transaction. The convictions for these two offenses arose from the stealing and concealment of the same television set, and both convictions cannot stand. *Lumpkins v. State*, 584 S.W.2d 244 (Tenn.Cr.App.1979). We reverse the judgment for concealing stolen property and dismiss that case.

On this appeal, the defendant presents 7 issues for review. First, he attacks the sufficiency of the evidence; he then asserts the trial judge erred in the following respects: permitting the defendant's wife to testify against him; admitting a photograph of the victim's body; failing to order a psychiatric examination of a State witness; admitting evidence not furnished to him prior to the trial; permitting an Assistant Attorney General to argue the defendant's motion for a change of venue; and denying him a change of venue. After considering the issues and the record, we conclude that the issues are without merit.

In view of the assignment attacking the sufficiency of the evidence, we will briefly summarize the evidence adduced during the defendant's 5-day trial. The defendant was convicted of the fatal stabbing of Mrs. Elizabeth Lyons, an 85-year-old lady, setting fire to her home and stealing her television set.

The victim was last seen taking her customary morning walk in the neighborhood of her Elizabethton residence between 10:30 and 11:00 on the morning of April 12, 1978. The defendant was seen earlier lounging on the front porch of the Thomas Apartments, where he resided. The Thomas Apartment building contains 4 apartments and is next to the one-family dwelling where the victim resided alone.

Smoke was seen emitting from the victim's home and at 1:25 P.M., the Elizabethton Fire Department received a telephone call that the house was on fire.

Upon entering the home, police and firemen found the charred, dismembered body of Mrs. Lyons on a bedroom floor beside the bed. There was a hole burned in the floor approximately 25 inches by 19 inches into which one of the victim's seared and severed legs had fallen. There was no other burned or charred area in the house. Expert testimony indicated that the fire had been started by an accelerant and that the fire was started no later than 12:30 P.M. On April 14, an autopsy revealed that Mrs. Lyons died before she breathed any smoke; her death was caused by 9 stab wounds in the chest and one in the neck. A fresh laceration was also found on the victim's scalp.

The victim's television set was the only property known to be missing. Her house was not disarranged or vandalized, and there was no sign of a struggle. A newslet-

ter from the World Prophetic Ministry, Inc., of Colton, California was found in the victim's home. The letter contained a news bulletin and a self-addressed envelope. Also found in the Lyons home was a church bulletin from the Calvary Baptist Church on Holly Lane for Sunday, May 15.

The garbage in the neighborhood was last picked up between 9:00 A.M. and 10:00 A.M. on April 12 when the City Sanitation employees collected Mrs. Lyons' garbage which was left on her front porch. They also emptied four large garbage cans for the occupants of the Thomas Apartments. During the investigation of the crime, officers found in one of the large garbage cans used by the occupants of Thomas Apartments building, a brown paper bag containing several items. One such item found in the paper bag was an envelope from the World Prophetic Ministry, Inc., of Colton, California which was addressed to the victim, Mrs. Lyons. The envelope appeared to have been burned or damaged by fire and smoke. A church bulletin from Calvary Baptist Church dated April 2, was also in the paper bag. The church bulletin was of the same type as that found in the victim's home, although it was for a different date. Also in the paper bag was a sales advertisement from T.G. & Y. Family Center, addressed to "resident, apartment 1, Thomas Apartments, Elizabethton, Tennessee." The defendant's address was Apartment 1 of Thomas Apartments. Two Black Label beer cans were also in the paper bag. One of the beer cans bore a fingerprint of Howard Wise, a State witness who testified that he had been on a beer drinking spree with the defendant in the defendant's apartment, which began a few days before the crimes of April 12 until about 2 days thereafter.

Furthermore, he testified that at about 11:00 A.M. on April 12, he left the defendant's apartment and went to his grandmother's house. He ate and then slept until about 1:00 P.M. After awakening, he called a taxicab, driven by the State witness Lester Calhoun, and returned to the defendant's apartment. He observed fire trucks and an ambulance at the victim's house.

Wise knocked on the defendant's door; however, receiving no response, he left. He later returned to the defendant's home at about 5:00 P.M. or 6:00 P.M. at which time he found the defendant at home.

According to Wise, he and the defendant continued to drink Black Label beer in the defendant's apartment until the following Friday, April 14, when Wise left after he and the defendant got into an argument. Between 7:00 P.M. and 9:00 P.M., Wise returned to the defendant's apartment and saw a second television set with a pair of gloves on top of it and a pasteboard box large enough to hold the television set. The defendant instructed Wise to replace some toys in the pasteboard box, and the defendant left the apartment with the television set. In a few minutes, the defendant returned without the television set, but he had a pair of gloves in his hand. The defendant did not have access to an automobile. Shortly after the defendant returned, Wise left the defendant's apartment and gave the information concerning the television set to police officers who subsequently arrested the defendant.

Wise recognized his scribbling on the T.G. & Y brochure that was found in the paper sack which had been placed in the garbage can. Wise had scribbled on the brochure during the time that he was drinking in the defendant's apartment. At no time during the drinking spree did the defendant mention these crimes to Wise.

At approximately 8:00 or 9:00 on April 14, the television set, which was identified as belonging to the victim, was found in a fence row beside the Thomas Apartments. One fingerprint of the defendant was found on the television set.

Pursuant to a search warrant, officers found cans of Black Label beer in the defendant's refrigerator, along with empty Black Label beer cans in the apartment. A red-checkered shirt belonging to the defendant was found stuffed in a cabinet under the sink where the defendant's estranged wife kept only cleaning materials; shirts and other clothing were not ordinari-

ly stored there. The defendant's wife gave the police officers a pair of pants that belonged to the defendant. Stains on the defendant's shirt and pants were established to be blood; the stain on the pants was established to be human blood.

There was other evidence introduced at trial which we do not deem necessary to detail. The defendant did not testify and offered no evidence contradicting or explaining the State's evidence.

The defendant, in his first issue, insists that the circumstantial evidence does not exclude every reasonable hypothesis other than that of his guilt and that the finger of guilt is not pointed unerringly at the defendant. We disagree; we find that the circumstantial evidence above-summarized meets the standard required by *McClary v. State*, 211 Tenn. 46, 362 S.W.2d 450 (1962); *Overton v. State*, Tenn.Cr.App., 521 S.W.2d 229 (1974).

■ The defendant also insists that the elements of premeditation, deliberation and malice were not proved; therefore, his conviction for first-degree murder cannot stand. Whether premeditation, deliberation, and malice are present in a given homicide case are questions of fact to be determined by the jury from all circumstances in evidence. *Cagle v. State*, 507 S.W.2d 121 (Tenn.Cr.App.1973); *Taylor v. State*, 506 S.W.2d 175 (Tenn.Cr.App.1973). These elements may be inferred from the fact that the defendant stabbed this elderly lady ten times in her own home and then attempted to conceal his crime by burning her body. The evidence supports the inference that the defendant was calm soon after the crime was committed. The record also supports the inference that the defendant had no legitimate business in the victim's home. Furthermore, no weapon was found on or near the victim's body; no provocation can be inferred from the evidence. Deliberation, premeditation and malice may be inferred from the brutality of the attack upon the victim or from the circumstances of repeated shots or blows. *State v. Banks*, 564 S.W.2d 947 (Tenn.1978); *Taylor v. State, supra; Cagle v. State, su-*

*pra.* The lack of provocation or cause for passion and that the victim was unarmed when attacked may also be considered. *Wilson v. State*, 548 S.W.2d 323 (Tenn.Cr. App.1976), aff'd., 574 S.W.2d 52 (Tenn.Cr. App.1978); *State v. Bullington*, 532 S.W.2d 556 (Tenn.1976). The defendant's treatment of the victim's body is sufficient to show premeditation. *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149 (Tenn.1945).

The defendant makes no question with respect to the evidence upon which he was found to be an habitual criminal. At the time of trial, he had been convicted of 9 separate felonies which were of the character to place him within the definition of an habitual criminal. He was on "extended furlow" from Brushy Mountain Penitentiary when the instant crimes were committed.

■ As previously stated, with the conviction for larceny of the television set, the conviction for concealing the stolen television set cannot stand. With this exception, we find evidence upon which a rational trier of fact could have been convinced beyond a reasonable doubt of the defendant's guilt of first-degree murder, arson, petit larceny and that he is an habitual criminal. The evidence of guilt meets the standard required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and Rule 13(e), Tennessee Rules of Appellate Procedure. The first issue, therefore, is without merit.

In Issue two, the defendant insists that the trial judge erred in admitting testimony of his wife because the testimony is protected by the marital privilege. The defendant's wife was permitted to testify as to the following facts: (1) she and the defendant separated on April 8, 1978; (2) she and the defendant had two children, one of whom was residing with the couple until April 8; (3) she gave a pair of pants to the police two days after the defendant was arrested; (4) she identified the red-checkered shirt as belonging to the defendant; (5) she normally kept cleaning cloths underneath the sink and the shirt found there was not used by her for that purpose; (6) she had never seen any items of Mrs. Lyons in the apartment;

(7) she and the defendant had a television set; and (8) she left because she and the defendant argued when he was drinking.

As to the marital privilege as asserted by the defendant, T.C.A. § 40–2404 states: "In all criminal cases, the husband or the wife shall be a competent witness to testify for or against each other."

However, in *McCormick v. State*, 135 Tenn. 218, 186 S.W. 95 (1916), the Supreme Court of Tennessee held that T.C.A. § 40–2404 did not abolish the common law marital privilege. The court held:

"Sound public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation."

In *Burton v. State*, 501 S.W.2d 814 (Tenn.Cr.App.1973), the Court of Criminal Appeals, citing from numerous authorities, held that the marital privilege extends only to confidential communications and a communication is not privileged unless it is confidential in nature. That is to say, if the communication is not intended to be a private one, the privilege has no application to it. Also, the privilege does not extend to conversations with third parties and acts or communications by the testifying spouse when the other spouse is not involved. Neither does the privilege extend to acts observed by the testifying spouse without the knowledge of the other spouse. The same rules concerning communications are applicable to facts otherwise coming to the knowledge of a spouse.

In *Adams v. State*, 563 S.W.2d 804 (Tenn. Cr.App.1978), it was held that the following conditions must exist before a communication may be considered privileged:

"(1) The communications must originate in a confidence that they will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation."

The fact and date of the separation is, by its very nature, not confidential. This information was known by at least one third person, Howard Wise. The number and residence of the children of a married couple is obviously not confidential by nature. The fact that the defendant owned certain items of clothing is not by nature confidential; a shirt and pants which are publicly worn and observed by many are obviously not confidential.

The wife's testimony that she kept cleaning cloths underneath the sink and that the shirt was not used by her for that purpose does not involve a communication with the defendant or acts involving the defendant. This testimony relates only to the witness's habits.

The negative testimony that the witness had not seen items belonging to the victim in her apartment involves no communication or matter confidential by nature. The witness, Howard Wise, if not others, was in the apartment and could observe whether the victim's correspondence, which was in plain view, was there. That the defendant had a television set in the apartment is not confidential by nature; this could be observed by the witness Wise or anyone else visiting the apartment.

*Arguendo*, the testimony of the defendant's wife that she left the defendant because of his drinking could be considered confidential. However, this evidence had no bearing on the defendant's guilt or innocence and did not affect the result of the trial.

Moreover, none of the four conditions above-quoted from *Adams v. State* existed. The marriage of these parties was extremely tumultuous. The defendant has been in the penitentiary for most of the time since the marriage; he has never supported his family. His wife has commenced

numerous criminal actions against him; on one occasion, she was obliged to shoot him to repel an attack made by him. She had left him many times because of his excessive drinking and his violent nature when drinking. For these reasons, we do not believe that the conditions 3 and 4 enumerated in *Adams* are met.

Conditions 1 and 2 likewise are not met. The facts testified to by the wife were not made known to her in a confidence that they would not be disclosed. Because of the nature of the evidence, its confidentiality is not essential to the full and satisfactory maintenance of the relation between the parties.

All four of these conditions must exist to protect the evidence by the marital privilege; we find that none of them do. There is no merit in Issue two.

■ The defendant next insists that the trial judge erred in admitting in evidence a black and white photograph of the victim's charred body; he insists that its prejudicial effect outweighed its probative value, if any. The black and white photograph depicts the charred body of the victim lying on the floor of her bedroom with the burned-out floor. The photograph shows the victim's body as it was found, with the exception that the dismembered leg was removed from underneath the floor and placed in its proper position on the body.

With respect to the relevancy of the photograph, what was said by Justice Brock in *State v. Banks, supra,* at 950 is applicable here:

"In this state, deliberation or premeditation is an element of the crime charged against this defendant, viz., first degree murder. We have held that in attempting to establish the degree of the homicide, the state may properly introduce evidence bearing on that issue. In *State v. LaChance,* Tenn., 524 S.W.2d 933 (1975), we observed:

'We think that the intent to kill may be inferred from the brutality of the attack.

\* \* \* \* \* \*

'[T]he succession of blows, the patently vicious manner of their infliction, the enormity of the cruelty and the horrendous injuries suffered provide further evidence of a wilful execution of an intent to kill.' 524 S.W.2d 937, 938. We quoted with approval from *McGill v. State,* 4 Tenn.Cr.App. 710, 475 S.W.2d 223 (1972):

'Concerning the weight and sufficiency of evidence to establish premeditation, and particularly with reference to the nature of the act causing death, many courts have held that deliberation and premeditation may be inferred from the manner in which the killing was committed; and that repeated shots, blows, and other acts of violence are sufficient evidence of premeditation.' 524 S.W.2d at 938.

And in *State v. Bullington,* Tenn., 532 S.W.2d 556, 560 (1976), we held that one circumstance from which the inference of premeditation may be drawn is 'repeated shots or blows inflicted upon the victim.'

We conclude, therefore, that the photographs here in issue may be considered to have passed the test of relevancy with respect to the issue of deliberation."

Furthermore, the photograph is relevant to prove arson. The photograph was offered after the defendant had cross-examined a police officer showing that arson was not first suspected but that the officers originally thought that the fire originated by the victim's being set aflame by a pan of burned beans that was on the stove in the kitchen and then her running into the bedroom. The photograph lends support to the State's theory that the fire is localized in the immediate area of the deceased's body in the bedroom. The evidence is relevant with respect to both the issue of deliberation in the murder case and on the question of whether the crime of arson had been committed.

The *Banks* case mandates that before admitting this type of evidence, the trial judge should weigh its probative value against its prejudicial effect and that if the "probative value is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues or misleading the jury" and other considerations, then the evidence should be excluded. The *Banks* case also observed that the Supreme Court has followed a policy of liberality in the admission of photographs in evidence and that this evidence lies within "the discretion of the trial court whose ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Banks, supra*, at 949; *State v. Hampton*, 601 S.W.2d 329, 332 (Tenn.Cr. App.1980) (reaffirming *Banks* ).

While this photograph is gruesome, it is hardly more gruesome than a verbal description of the condition of the body and the mental picture that might be made by one from the verbal description. The crime was gruesome and this fact is apparent from either a verbal description or a photograph. 'We note that the trial judge carefully considered whether to admit this photograph in evidence and he excluded color photographs that were offered. Since we cannot say that the trial judge abused his discretion, we must resolve this issue in favor of the State.

The defendant next insists that the trial court erred in refusing to order the State witness, Howard Wise, to submit to a psychiatric examination. The trial judge conducted a hearing to determine the competency of this witness to testify. The record is clear that this 24-year-old witness commenced sniffling glue when he was 14 years of age. He has since used THC, LSD, glue, barbiturates, speed and alcohol. Records of the Lakeshore Mental Health Institution indicated that he had been admitted for treatment 4 times between July, 1974 and July, 1978. The final diagnosis of Wise on his last admission to the institution was "drug dependency—hallucinogenics." No expert witness was introduced to render an opinion as to whether Wise understood the obligations of an oath or his ability to receive, remember, and narrate impressions when not under the influence of a hallucinogen.

The Assistant Chief with the Elizabethton Police Department testified that he was personally acquainted with Wise and that since 1974, Wise had been arrested from 14 to 16 times for glue sniffling and 7 to 10 times for public drunkenness. The policeman testified that he had seen Wise while under the influence of glue and alcohol and also when he was not under the influence of alcohol or drugs. When he is not under the influence, he is capable of carrying on a normal conversation and demonstrated the ability to remember and relate events which he has seen. In the opinion of the policeman, Wise was able to testify to the truth under oath when sober. Wise, testifying for the State at the hearing, admitted his drug addiction and outlined its history. He demonstrated that he understood the obligations of an oath and gave a factual account of past events which was corroborated by the medical records. He testified that he drank only alcohol with the defendant during the days immediately before and after the crimes and remembered the events of those days. Wise testified coherently and was responsive to the questions by the attorneys. He was an inmate in jail when testifying at the pre-trial hearing and also at trial and was not under the influence of alcohol or drugs. Many matters to which he testified at trial were corroborated by other witnesses.

T.C.A. § 24–1–101 provides: "Every person of sufficient capacity to understand the obligation of an oath is competent to be a witness."

The question of the competency of a witness is a matter for determination by the trial judge. *Arterburn v. State*, 216 Tenn. 240, 391 S.W.2d 648 (1965); *Harris v. State*, 3 Tenn.Cr.App. 64, 457 S.W.2d 370 (1970), *cert. denied*, 401 U.S. 978, 91 S.Ct. 1206, 28 L.Ed.2d 328 (1971). A lunatic or a person adjudged insane is competent as a witness if, at the time he is offered as a witness, he has sufficient understanding to comprehend the obligation of an oath and capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue. *Turner v. Bell*, 198 Tenn. 232, 279 S.W.2d 71 (1955).

■ There is no statutory or case law in Tennessee authorizing a court to compel a prospective witness, not a party interested in the case and present only by compulsion of a subpoena, to submit to a psychiatric examination. In *Forbes v. State*, 559 S.W.2d 318, 321 (Tenn.1977), our Supreme Court held:

> "We hold that in any case involving a sex violation, the trial judge has the inherent power to compel a psychiatric or psychological examination of the victim, where such examination is necessary to insure a just and orderly disposition of the cause. Such power should be invoked only for the most compelling of reasons, all of which must be documented in the record. This discretion should be exercised sparingly."

The Supreme Court, in the *Forbes* case, carefully restricted that holding to complaining victims in sex cases. We would not attempt to broaden that holding. There are serious questions that the witness's constitutional rights of due process and privacy might be violated in ordering a non-litigant, non-complaining, and disinterested witness to submit himself for psychiatric examination on application of one of the litigants. However, we pretermit these constitutional questions because the evidence supports the trial judge's finding that Wise was legally competent to testify; because the evidence did not afford a compelling reason to order the witness to submit to the examination and cooperate with the examiners; and because the *Forbes* rule is applicable only to complaining victims in sex cases.

■ The defendant makes issue that the court erred in allowing the introduction of a photograph showing the front porch of the victim's residence. Prior to trial and pursuant to Rule 12(d)(2) of the Rules of Criminal Procedure, the defendant filed a request for notice of the State's intention to use any evidence discoverable under Rule 16, T.R. Cr.P. The State filed a reply, announcing the intention to use all items contained in the Attorney General's file, all of which had been provided to defense counsel. The trial judge, after hearing lengthy argument, overruled the defendant's objection to the admissibility of the photograph.

The record fails to clearly establish that the photograph was not made available to the defendant before trial; but, if it was withheld, it was not done so intentionally. It was introduced only for the purpose of depicting the location of the victim's mailbox, which was of little, if any, probative effect; and the characteristics shown in the photograph could have been described by witnesses. We have no hesitancy in saying that the admission of this evidence did not affect the result of the trial. *See* Rule 36(b), Tennessee Rules of Appellate Procedure.

■ Moreover, the defendant says, and we agree, that the committee comments to the Tennessee Rules of Criminal Procedure are of little benefit on the issue of admissibility of evidence following the prosecution's failure to comply with a Rule 16 or a Rule 12(d)(2) request. We also agree with defense counsel that the Tennessee Rule was derived from its federal counterpart, Rule 12, Federal Rules of Criminal Procedure, and that the Federal Advisory Committee notes to the federal rule, offers some assistance. The Federal Advisory Committee note states, in part, as follows:

> "An automatic exclusion of such evidence, particularly where the failure to give notice was not deliberate, seems to create too heavy a burden upon the exclusionary rule of evidence. . . ."

We hold that evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. See Rule 16(d)(2). The exclusionary rule should not be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be employed for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the

State or the defendant of competent evidence.

There is no hint of any prejudicial effect from the failure of the defendant to inspect the photograph before it was offered in evidence. The photograph was otherwise competent evidence and not subject to suppression. The trial judge correctly admitted it.

The defendant next complains that the court erred in permitting a member of the District Attorney General's office to argue on the defendant's behalf a motion for a change of venue. The court originally appointed Mr. Dan M. Laws, Jr. and Ms. Teresa Murray to represent the defendant. After Ms. Murray had done considerable work on the case, including preparation of material to be presented on the change of venue motion, she accepted employment with the District Attorney General in the department that enforces child support orders. Upon her appointment, she asked the court for permission to withdraw from the case because of her recent employment by the District Attorney General. Mr. Laws told the court that in his opinion, the employment with the Attorney General in the civil division did not disqualify Ms. Murray from proceeding to act as co-counsel in the case and that he had discussed the matter with the defendant and that the defendant, knowing the facts, desired Ms. Murray to continue to represent him.

Mr. Laws placed the defendant on the witness stand in connection with this matter. The defendant testified that he was well aware that Ms. Murray was employed by the District Attorney General's office but still desired that she continue to represent him in the case. The District Attorney General and Ms. Murray both questioned the propriety and legality of Ms. Murray's continuing to represent the defendant. However, the trial court acquiesced in permitting Ms. Murray to argue the motion on the change of venue, since the matter was that day set for argument and Ms. Murray had made the preparation. ▮▮▮▮ If the court erred in permitting Ms. Murray to argue the motion for a

change of venue, the defendant cannot be heard to complain because any error was invited personally by the defendant as well as by Mr. Laws. It has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct. *Armstrong v. State,* 548 S.W.2d 334 (Tenn. Cr.App.1977); *Mallicoat v. State,* 539 S.W.2d 54 (Tenn.Cr.App.1976); *Norris v. Richards,* 193 Tenn. 450, 246 S.W.2d 81 (1952); *Roseberry v. Lippner,* 574 S.W.2d 726 (Tenn.1978). Rule 36(a), Tennessee Rules of Appellate Procedure.

▮▮▮▮ Further, any error committed was cured. Ms. Murray participated in the hearing on the motion for change of venue held March 23, 1979 and promptly withdrew from the case. The motion was renewed and another hearing was held on June 11, 1979 in which Ms. Murray did not participate as counsel. Any error or prejudice caused by Ms. Murray's participation in the first hearing was cured by the trial judge in granting a second hearing and argument. This issue is overruled.

▮▮▮▮ The defendant next complains of the trial court's refusal to order a change of venue. This is a question within the discretion of the trial judge, and we may not reverse his action unless there is a clear abuse of this discretion. *Broz v. State,* 4 Tenn.Cr.App. 457, 472 S.W.2d 907 (1971), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2054, 32 L.Ed.2d 336 (1972); *Lang v. State,* 3 Tenn. Cr.App. 108, 457 S.W.2d 882 (1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

The record reflects that extensive publicity was given this occurrence by news media. We would not describe the newspaper articles enclosed in the record as "inflammatory" or "sensational" in nature, although some of the articles expressed indignation that the defendant, with his lengthy criminal record, was permitted to be on "extended furlow" at the time these crimes were committed. The offense occurred and

the defendant was arrested in April, 1978; and most of the publicity followed soon thereafter. The defendant was not tried until June, 1979. The defendant accepted the jury as constituted without exhausting his peremptory challenges.

Many of the potential jurors had read or heard about the case prior to trial, but many potential jurors were excused for other reasons (i. e., that they could not follow the law with respect to the death penalty, etc.). Our reading of the record convinces us that the jurors who were actually accepted and rendered the verdict were unprejudiced by pretrial publicity and were competent jurors. This is the ultimate test for our determination. *Adams v. State, supra,* at 807.

It was held in *Sommerville v. State,* 521 S.W.2d 792 (Tenn.1975) that the failure to use available peremptory challenges to remove objectionable jurors precludes reliance upon the alleged disqualifications of jurors on appeal. Also, much of the effect, if any, of the publicity was eroded by the length of time before trial.

The defendant points to no specific portions of the record which would require a finding of unfairness as to the method of jury selection or as to the competency of the jurors actually selected. In *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the United States Supreme Court reaffirmed a previous holding of that court that "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." The court reaffirmed that unfairness would not be presumed from a showing of extensive media coverage in the absence of a "trial atmosphere utterly corrupted by press coverage." 97 S.Ct. 2303.

There was evidence heard, pro and con, on the motion as to whether the defendant could receive a fair trial in Carter County. This question of fact was resolved by the trial judge, and there was evidence to support his finding. We note also that the jury declined to impose the death penalty.

■ We do not find that the trial judge abused his discretion in failing to order a change of venue. There is no showing of "undue excitement" as required by T.C.A. § 40–2201 or any constitutional deprivation. This issue must be resolved in favor of the State.

It results that the judgment of conviction for concealing stolen property must be reversed and dismissed. The remaining judgments are affirmed.

DWYER and CORNELIUS, JJ., concur.