IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 7, 2026

## STATE OF TENNESSEE v. RAYMOND BENSON

**Appeal from the Criminal Court for Shelby County**
No. 21-03172    Jennifer Fitzgerald, Judge

_____

### No. W2025-00309-CCA-R3-CD

_____

The defendant, Raymond Benson, was convicted by a Shelby County Criminal Court jury of reckless homicide and convicted felon in possession of a handgun for which he received an effective sentence of four years suspended to supervised probation. On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for reckless homicide and asserts that the trial court erred in denying his motion to impeach a State's witness with prior convictions. Following our review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Phyllis Aluko, District Public Defender; Barry W. Kuhn (on appeal), and Constance Barnes and Devarius Minor (at trial), Assistant Public Defenders, for the appellant, Raymond Benson.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Kevin McAlpin and Lauren Hutton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

The defendant was indicted for second-degree murder, convicted felon in possession of a handgun,[1] and theft of property valued over $2,500, arising out of the murder of the victim, Ivan Payton, during the early morning hours of May 16, 2021. The State dismissed the theft charge and proceeded to trial on the remaining two counts.

The State's proof at trial showed that on the date of the murder, Adam Ash and Crystal Baggett were living in a house on Burr Road in Memphis. Sometime after 2:30 a.m., Mr. Ash and Ms. Baggett arrived home and a handful of people, including the defendant, were at the house. The defendant was asleep on the couch, which was not unusual because the defendant was a friend of Mr. Ash's and sometimes stayed with him. Not long after they got home, the victim arrived and began trying to wake up the defendant. According to both Mr. Ash and Ms. Baggett, the defendant and the victim were friends, "call[ing] each other brothers basically," and the victim was concerned about the defendant's use of drugs. The victim "wanted [the defendant] to do better." The victim eventually roused the defendant, and the two engaged in a verbal altercation that turned physical.

The victim hit the defendant, the defendant hit the victim back, and the two men "ended up scuffing down the front porch" and into the middle of the yard. From their vantage point on the front porch, Mr. Ash and Ms. Baggett could both easily observe the fight taking place in the yard. The two men continued to wrestle and "do[] a little bit of fighting," and then the fight appeared to come to an end. The victim helped the defendant up, gave him a kiss on the cheek, and said, "I love you. Just get off this sh*t. I'm doing what your brother would be doing." Thinking that the fight was over and there were no significant injuries, Mr. Ash started to walk back into the house. Ms. Baggett saw the victim start to walk away and then heard the victim say, "What? You gonna shoot me, b*tch." The defendant fired a gun that was now in his hand, and the victim "instantly went down." Neither Mr. Ash nor Ms. Baggett had seen either man with a gun until that point in time. Upon hearing gunshots, Mr. Ash went back out onto the porch and yelled to the defendant, "What you do that for, motherf***er?" Ms. Baggett heard the defendant respond, "What did you want me to do, let him beat me up?" At that, the defendant got into the victim's car, which the victim had left running, and drove away.

An autopsy revealed that the victim sustained four gunshot wounds with the wound to the chest being immediately fatal. The trajectory of the fatal bullet was front to back and downward, which could be consistent with the victim moving forward when shot. The medical examiner determined that the victim's cause of death was multiple gunshot wounds and manner of death was homicide.

---

[1] The defendant stipulated that he was previously convicted of a felony offense on January 27, 2009.

The defendant testified that at the time of the offense, he was using drugs because his brother had recently died but was preparing to move to Iowa in an effort to change his behavior. On the night of the murder, the defendant went to visit his friend, Mr. Ash, to socialize and buy methadone "wafers." When the defendant arrived, Mr. Ash did not have the drugs but was attempting to secure them. The defendant played dominos, drank, and consumed Xanax while he waited. He eventually went inside and passed out on the couch.

According to the defendant, he was awakened by a "sharp . . . [e]xcruciating pain" down his back. The pain was being caused by the victim putting his thumb on the defendant's "pressure points" to "try to wake [him] up." The defendant claimed the victim was "no one to [him]," not "like a brother" or a "close associate." In fact, the victim and two other men had "jumped" the defendant a week earlier. When the victim finally released his grip, the defendant stood up and discovered that his phone was missing, his pockets were turned inside out, and his money was gone.

The defendant went outside and walked down the ramp off the porch. Moments later, the victim came up behind him, grabbed him around the neck, and slammed him against a car that was parked in the yard. As the defendant struggled to get the victim off of him, the victim pulled a gun out and placed it against the defendant's stomach. The defendant put his hands in the air, but the victim "slung [the defendant] on the ground" and stood over him. The victim attempted to strike the defendant with the gun, but the defendant dodged the blow. The victim connected on his second strike but somehow lost the gun before his third attempt. The victim released the defendant to look for the gun, but the defendant saw the gun first and grabbed it. The victim taunted the defendant and then charged at him. As the defendant "back peddl[ed] trying to scoot back," he fired the gun at the victim. He did not know how many times he shot. According to the defendant, the victim was calling him names and walking toward him in "a fast aggressive manner" when he fired the gun. He did not mean to hurt the victim and only shot "[o]ut of fear." The defendant dropped the gun and left the scene in the victim's car. Two days later, the defendant turned himself into the police with the assistance of his cousin who was a Memphis police officer.

Following the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of reckless homicide and, as charged, of convicted felon in possession of a handgun. The trial court imposed a sentence of four years' supervised probation.[2] The defendant appealed.

---

[2] The defendant's probation was revoked in April 2025 after a violation.

*Analysis*

On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for reckless homicide and asserts that the trial court erred in denying his motion to impeach State's witness Adam Ash with prior convictions. The State responds that the evidence is sufficient and that the defendant waived his impeachment claim. We agree with the State.

## I. Sufficiency

The defendant argues the evidence is insufficient to sustain his conviction for reckless homicide because the proof did not show that he acted recklessly, but instead, that he shot the victim in self-defense.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a

convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Reckless homicide is the reckless killing of another and is considered a result-of-conduct offense. Tenn. Code Ann. § 39-13-215(a); *State v. Davis*, 466 S.W.3d 49, 70 (Tenn. 2015) (citing *State v. Parker*, 350 S.W.3d 883, 910 n.16 (Tenn. 2011)). A reckless act occurs regarding "the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-302(c). In this context, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.*

Again, the defendant contends that the evidence is insufficient to sustain his conviction for reckless homicide because the proof did not show that he acted recklessly, but instead, that he shot the victim in self-defense. However, in the light most favorable to the State, a rational jury could conclude that the defendant "consciously disregarded a substantial risk" by firing a gun four times at an unarmed victim and was, therefore, not acting in self-defense.

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). At the time of the offense, the applicable statute provided:

(2) [A] person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2). When self-defense is fairly raised by the proof, the State is required to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020).

Here, the jury was presented with proof from two eyewitnesses that after a minor skirmish, the victim helped the defendant up off the ground, kissed him on the cheek, and urged him to get off drugs. The defendant then produced a gun and shot the victim four times. Although the defendant testified conversely, claiming the victim brutally attacked him and was the one who pulled out a gun, the jury heard all the evidence and by its verdict accredited the testimony of the State's witnesses over that of the defendant. It is well "within the prerogative of the jury to reject the claim of self-defense." *Goode*, 956 S.W.2d at 527. Moreover, we deem it worthy of note that contrary to the defendant's assertion, the physical evidence casts doubt on the defendant's testimony because the trajectory of the bullet fired into the victim's chest was in a downward direction, which would not be possible if the defendant fired up at the victim from the ground as the victim charged at him. It was within the province of the jury to find the defendant's testimony not credible. The State presented sufficient evidence from which the jury could have concluded that the defendant did not act in self-defense, and we affirm the defendant's conviction for reckless homicide.

## II. Impeachment

The defendant also asserts that the trial court erred in denying his motion to impeach State's witness Adam Ash with his prior convictions. The State submits the defendant has waived this issue as he did not seek admission of Mr. Ash's prior conviction pursuant to

Tennessee Rule of Evidence 609 at trial. Upon our review of the record, we agree with the State.

The defendant filed a pre-trial notice of intent to use the prior bad conduct and convictions of State's witness Adam Ash at trial.[3] More specifically, the defendant intended to question Mr. Ash about his drug use should Mr. Ash deny the same. At a hearing on the motion, defense counsel stated to the court:

> But we also did file an additional motion for notice of intent to use prior bad conduct against the State of Tennessee witnesses because several of them have felony convictions. Some of those do not qualify. And I will be very candid[] with the Court. They do not qualify as it relates to credibility. It's not about untruthfulness or showing that they have committed a crime of moral turpitude.

> The only manner in which this would arise is if during their cross-examination the State's witnesses deny using drugs or the presence of drugs. Then we were requesting permission to use their prior convictions and their pending cases showing a continuation of drug use or possession of drugs to impeach their testimony.

Despite the limitation expressed by the defendant, the trial court went on to review Mr. Ash's prior record and determined that a drug conviction from July 2020 was within the ten-year time period discussed in Tennessee Rule of Evidence 609, but because it did not involve fraud or deceit, the trial court determined Mr. Ash could only be asked about it if he denied using drugs on the stand.

The defendant contends on appeal that the trial court erred in disallowing impeachment of Mr. Ash with past drug convictions pursuant to Tennessee Rule of Evidence 609. However, as detailed above, the defendant failed to present an argument related to Rule 609. Furthermore, the defendant specifically told the court that Mr. Ash's conviction was not admissible to attack his credibility and only wanted permission to cross-examine Mr. Ash about the conviction if he "den[ied] using drugs or the presence of drugs." The court ultimately ruled as the defendant requested, "that if the[] witness[] get[s] up there and say[s], well, no, I don't use drugs, I think [he] open[s] the door and the question can be asked about these convictions." "It has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct."

---

[3] The motion also referred to the victim, Crystal Baggett, and another witness, Jamie Macarthur, who did not testify at trial. However, the defendant's argument on appeal focuses solely on witness Adam Ash.

*State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981) (collecting cases); *see* Tenn. R. Crim. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). As such, the defendant has waived this issue.

Regardless, even if the trial court erred in disallowing the requested impeachment evidence, such error was harmless. An error by the trial court does not require relief unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Ms. Baggett was an eyewitness to the offense along with Mr. Ash, and unlike Mr. Ash, Ms. Baggett actually witnessed the moment of the shooting and provided more details on the events of the evening than Mr. Ash. We conclude that even if the trial court erred in not allowing the defendant to impeach Mr. Ash with his prior drug conviction, we cannot say that such error "more probably than not affected the judgment." The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE